NOTICE
Decision filed 04/06/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210342-U

NO. 5-21-0342

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* HARLEY S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Wayne County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-28 |
| | ) | |
| Reggie S., | ) | Honorable |
| | ) | Matthew J. Hartrich, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justice Moore concurred in the judgment.
Justice Welch concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: We hold that portion of the circuit court's judgment finding the respondent an unfit person was not contrary to the manifest weight of the evidence and affirm. We reverse that portion of the circuit court's judgment terminating the respondent's parental rights based on the circuit court's finding that termination of his parental rights was in the minor child's best interest where the record does not demonstrate a good cause, or appropriate safeguards implemented prior to the circuit court proceeding with the best interest hearing with the respondent appearing via video conferencing.

¶ 2    The respondent, Reggie S., is the father of Harley S., born December 2014. On August 4, 2021, the circuit court of Wayne County found Reggie to be an unfit person within the meaning of the Adoption Act (750 ILCS 50/1(D) (West 2020)) for failing to

1

make reasonable efforts to correct the conditions that were the basis for the removal of Harley (*id*. § 1(m)(i)) and failing to make reasonable progress toward the return of Harley (*id*. § 1(m)(ii)) during the periods of October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021; such periods following the adjudication of abuse or neglect on October 10, 2018. On September 29, 2021, the circuit court determined that it was in Harley's best interest to terminate Reggie's parental rights and, the same day, entered a written order terminating Reggie's parental rights regarding Harley.

¶ 3    Reggie now appeals the circuit court's judgment terminating his parental rights arguing that he was denied his constitutional right to attend the circuit court's best interest hearing in person. Reggie further argues that the circuit court's findings that Reggie was an unfit person and that termination of his parental rights was in the best interest of Harley were against the manifest weight of the evidence. Finally, Reggie argues that the circuit court abused its discretion in denying Reggie's agreed motion to continue the circuit court's best interest hearing and motion for transcript. For the following reasons, we affirm in part and reverse in part the judgment of the circuit court.

¶ 4                                I. BACKGROUND

¶ 5    On April 15, 2018, Harley's mother[1] contacted law enforcement alleging that Reggie had choked her. When law enforcement arrived, it was reported that Harley had witnessed the domestic violence and had been exposed to Reggie's methamphetamine use.

---

[1]Harley S.'s biological mother was also a respondent in the circuit court proceedings but is not a party to this appeal. As such, we will only recite the background information relevant to Reggie's challenges on appeal.

The Illinois Department of Children and Family Services (DCFS) was contacted, and Harley was taken into protective custody on April 17, 2018. On April 18, 2018, a petition for adjudication of wardship pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) was filed with the circuit court. The circuit court conducted a shelter care hearing the same day and determined that there was probable cause to believe that Harley was neglected or abused, but that it was not a matter of immediate and urgent necessity that he be placed in shelter care. As such, the circuit court returned Harley to Reggie's care and directed Reggie to comply with a DCFS service plan for six months. The circuit court further directed Reggie to submit to random drug testing including an initial test to be administered *instanter*.

¶ 6    On April 23, 2018, the Wayne County Probation Office filed a report informing the circuit court that it was unable to complete Reggie's drug test on April 18, 2018, and that Reggie was advised to expect a phone call informing him when to report back for the drug test. The report indicated that the probation office attempted to contact Reggie, but that the phone number provided went to voicemail. According to the report, the probation office left a voice message on April 20, 2018, directing Reggie to report for drug testing by 4 p.m. that day and Reggie failed to report or contact the probation department as directed. Finally, the report indicated that Reggie did appear at the probation office on April 23, 2018, and stated that he had not received the voice message and then stated that he did not get home from work in time to report for the drug test.

¶ 7    On July 11, 2018, the circuit court conducted another shelter care hearing at the request of the State. According to the circuit court's docket entry, Reggie had tested

3

positive for methamphetamine[2] and was noncompliant with the services offered by DCFS. The docket entry indicated that Reggie arrived late to the shelter care hearing and appeared *pro se*. At Reggie's request, the circuit court appointed counsel to represent Reggie; however, the circuit court proceeded with the shelter care hearing with Reggie remaining *pro se*. The circuit court's docket entry further stated that Reggie participated in the shelter care hearing for approximately five minutes when he abruptly interrupted the witness, got agitated, and voluntarily left the courtroom notwithstanding the circuit court's attempts to get him to stay. The circuit court proceeded with the shelter care hearing in Reggie's absence and found Harley to be abused or neglected due to Reggie's drug use and failure to comply with his service plan. As such, the circuit court found that it was a matter of immediate and urgent necessity to protect Harley and placed Harley in the care and custody of DCFS.

¶ 8    On August 14, 2018, DCFS filed a status report with the circuit court. The status report indicated that Reggie had a long criminal record and was known to be volatile and uncooperative. The status report stated that Reggie had not cooperated with DCFS services or scheduled drug testing, and that Reggie had admitted that he would test positive for methamphetamine if tested. The status report further indicated that Reggie had not obtained stable and safe housing, had not obtained stable employment, had failed to appear for two drug tests, and had failed to attend visitation with Harley on August 13, 2018. According to the status report, Reggie's service plan required him to successfully complete domestic

---

[2]The date of Reggie's positive drug test was not provided in the circuit court's docket entry of July 11, 2018.

violence services, trauma informed psychotherapy, substance abuse assessment, random drug urinalysis, and therapeutic parenting education. Finally, the status report indicated that it was DCFS's recommendation that the custody and guardianship of Harley remain with DCFS.

¶ 9    On August 25, 2018, Reggie was taken to the Fairfield Memorial Hospital with an altered mental status and a potential drug overdose after apparently running out of a house and falling into a sewage drainage ditch. The medical report indicated that Reggie tested positive for methamphetamine but that an overdose could not be confirmed. Reggie was treated for a potential overdose and was then discharged.

¶ 10    On September 4, 2018, DCFS filed a resource referral report with the circuit court. The resource referral report indicated that Reggie had failed to appear for drug testing on June 15, 2018, July 30, 2018, and August 27, 2018. The resource referral report also indicated that Reggie had tested positive for benzodiazepines, cocaine, methadone, opiates, phencyclidine (PCP), tetrahydrocannabinol (THC), ecstasy, and heroin metabolite on June 29, 2018.

¶ 11    DCFS next filed a service plan with the circuit court on September 14, 2018. The service plan stated that Reggie had made no progress with his assigned services. According to the service plan, Reggie was dropped from his anger management class due to nonattendance and Reggie had failed to notify his caseworker when he changed phone numbers or moved locations. The service plan also stated that Reggie had not refrained from using drugs and Reggie had pending criminal charges, but was not on probation, parole, or incarcerated at that time. The service plan went on to state that Reggie had missed

5

visitations with Harley for failing to take a drug test before the visits and that Reggie was homeless and staying with his sister. The service plan further stated that Reggie was employed but that he did not have consistent work hours. As such, the service plan indicated that Reggie was rated unsatisfactory progress on his tasks of parenting services, anger management, cooperation with DCFS, obtainment of housing, random drug testing, and substance abuse assessment. Finally, the DCFS service plan recommended a permanency goal of return home within 12 months.

¶ 12    On October 10, 2018, the circuit court entered an adjudicatory order pursuant to section 2-21 of the Act. 705 ILCS 405/2-21 (West 2018). The adjudicatory order stated that the circuit court had found, by a preponderance of the evidence, that Harley was abused or neglected as defined by section 2-3 of the Act (*id*. § 2-3) in that Harley was in an environment that was injurious to the welfare of a minor child as defined in section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)). The circuit court based its finding on Harley being subjected to an environment of domestic abuse that was inflicted by Reggie. The circuit court's adjudicatory order admonished Reggie to comply with the terms of his service plan and correct the conditions that required Harley to be taken into care or risk the termination of his parental rights.

¶ 13    On December 12, 2018, DCFS filed a dispositional report with the circuit court. The dispositional report stated that Reggie was arrested on September 5, 2018, for the possession of methamphetamine and on two warrants for driving with a suspended license. According to the dispositional report, Reggie was released on bond on November 29, 2018, and had a pending court date. The dispositional report also indicated that Reggie had not

obtained housing or employment and had not complied with assessments for substance abuse, mental health, domestic violence, and parenting services. As such, the dispositional report recommended to the circuit court that guardianship of Harley be granted to DCFS.

¶ 14   DCFS next filed a second service plan with the circuit court on January 2, 2019. The second service plan indicated that Reggie was awaiting sentencing for a drug charge and that he had been incarcerated from September to November 2018. The second service plan again rated Reggie as unsatisfactory progress on his tasks of parenting services, anger management, cooperation with DCFS, obtainment of housing, random drug testing, and substance abuse. The second service plan recommended that the permanency goal remain return home within 12 months. On the same day, the circuit court entered an agreed dispositional order finding Reggie unfit and unable to care for Harley based on Reggie's failure to participate in services and his pending sentencing for a felony offense. The agreed dispositional order made Harley a ward of the court and placed Harley in the custody and guardianship of DCFS.

¶ 15   On May 30, 2019, DCFS filed a permanency report with the circuit court. The permanency report indicated that Reggie had not obtained housing or employment, and that he had not complied with assessments for mental health, domestic violence, or parenting services. The permanency report stated that it was unknown whether Reggie had successfully completed substance abuse treatment or if he left without completing the services. The permanency report recommended that guardianship of Harley be continued with DCFS.

¶ 16     DCFS filed a third service plan with the circuit court on July 8, 2019. The third service plan stated that Reggie had not made any progress since the last service plan. As such, the third service plan indicated that Reggie maintained an unsatisfactory progress rating on his tasks of parenting services, anger management, cooperation with DCFS, obtainment of housing, and random drug testing. The third service plan also indicated that Reggie was in "rehab" from January 2019 to February 2019, but it did not state what type of rehabilitation program Reggie had attended. The service plan further indicated that Reggie was "rearrested again in May 2019." The recommended permanency goal stated in the third service plan was return home within 12 months.

¶ 17     DCFS filed a second permanency report with the circuit court on October 17, 2019. The second permanency report repeated the information contained in the initial permanency report that Reggie had not obtained housing or employment and that he had not complied with assessments for mental health, domestic violence, or parenting services. There was no report of progress on behalf of Reggie within the second permanency report. As such, the second permanency report recommended that custody and guardianship of Harley be continued with DCFS.

¶ 18     On November 13, 2019, the circuit court entered a permanency order finding that Reggie had not made reasonable efforts toward returning Harley home. The circuit court's permanency order directed that the custody and guardianship of Harley remain with DCFS with a permanency goal of return home within 12 months.

¶ 19     On January 2, 2020, DCFS filed a status report with the circuit court which again indicated that Reggie had not made any progress on his assigned services. On January 24,

8

2020, DCFS filed a fourth service plan with the circuit court which indicated that Reggie was incarcerated within the Illinois Department of Corrections (IDOC) and that he had made no progress on assigned services. The fourth service plan also noted that Reggie had failed to sign the necessary releases of information in order for DCFS to verify that he was engaged in services while incarcerated. The recommended permanency goal of the fourth service plan remained return home within 12 months.

¶ 20    On July 16, 2020, the State filed a motion for termination of parental rights and for appointment of guardianship with power to consent to adoption (motion for termination). The motion for termination stated that Harley was adjudicated neglected on October 10, 2018, and that a dispositional order was entered on January 2, 2019. According to the State's motion for termination, Reggie was an unfit person as defined in the Adoption Act (750 ILCS 50/1(D) (West 2020)) for the following reasons:

"a. Abandonment of the child. 750 ILCS/50/1(D)(a)[.]

b. Failure to maintain a reasonable degree of interest, concern[,] or responsibility as to the child's welfare. 750 ILCS/50/1(D)(b)[.]

c. Desertion of the child for more than 3 months next proceeding the commencement of the Adoption proceeding. 750 ILCS 50/1(D)(c)[.]

d. Failure to Protect the child from conditions within his environment injurious to the child's welfare. 750 ILCS 50/1(D)(g)[.]

e. Failure by the parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month

9

period following the adjudication or neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987. 750 ILCS 50[/]1(D)(m)(i)[.]

f. Failure by the parent to make reasonable progress toward the return of the child from the parent during a 9-month period following the adjudication of neglected minor under Section 2-3 of the Juvenile Court Act of 1987. 750 ILCS 50/1(D)(m)(ii)[.]"

¶ 21 The State's motion for termination further alleged that it was in Harley's best interest and welfare that Reggie's parental rights be forever and irrevocably terminated. The State's motion for termination also stated that it was in the best interest and welfare of Harley that DCFS continue as legal guardian and custodian of Harley and that DCFS be vested with the power to consent to the adoption of Harley.

¶ 22 On August 4, 2020, DCFS filed a fifth service plan with the circuit court. The fifth service plan indicated that Reggie had not made any substantial progress and that Reggie remained incarcerated where he was not attending any services. As such, Reggie was again rated unsatisfactory progress on his tasks of parenting services, anger management, cooperation with DCFS, obtainment of housing, random drug testing, and substance abuse. The fifth service plan noted that the State had filed a motion for termination of parental rights, but that the hearing on the State's motion for termination was continued due to the COVID-19 pandemic.

¶ 23 DCFS filed a third permanency report with the circuit court on October 7, 2020. The third permanency report indicated that Reggie had "just begun to be cooperative" with DCFS. According to the third permanency report, Reggie had attended parenting education

class, mental health therapy, and substance abuse treatment. The third permanency report stated that Reggie had reported being employed and that Reggie had monthly visits with Harley since being released from IDOC in July 2020. The third permanency report, however, also noted that Reggie had been sentenced to IDOC twice and had spent time incarcerated in the Wayne County Law Enforcement Center since the case was opened. The third permanency report further stated that Harley had behavioral issues in school "before and after visits w/Reggie." Finally, the third permanency report stated that Reggie had not successfully completed his services and recommended that the circuit court change the permanency goal to substitute care pending termination of parental rights.

¶ 24    On January 8, 2021, DCFS filed a fourth permanency report with the circuit court. The fourth permanency report again stated Reggie was arrested on September 5, 2018, for possession of methamphetamine and two warrants for driving with a suspended license. Reggie was released on bond on November 29, 2018, and then sentenced to three years' incarceration within IDOC on June 27, 2019, with 123 days credit for time served. The fourth permanency report indicated that Reggie was released from custody on July 7, 2020, and that on October 9, 2020, Reggie was operating a motor vehicle that struck a 10-year-old boy who later died from his injuries. The toxicology report of Reggie's urine taken after the accident indicated that amphetamine and methamphetamine were detected. According to the fourth permanency report, Reggie was being held at the Jefferson County jail and had been charged with a Class 4 felony aggravated driving under the influence (DUI) with no valid insurance, among other charges stemming from the accident. DCFS indicated in its fourth permanency report that it was awaiting an update on that matter. The

11

fourth permanency report went on to indicate that Reggie had not obtained housing or employment and that he had not successfully completed domestic violence services, trauma informed psychotherapy, mental health, substance abuse assessment, or therapeutic parenting education. DCFS again recommended that the circuit court change the permanency goal from return to home within 12 months to substitute care pending termination of parental rights. DCFS based its recommendation on Reggie's overall unsatisfactory progress with his service plan and the length of time that Harley had been in care.

¶ 25   The circuit court entered another permanency order on February 10, 2021. The permanency order stated that Reggie was incarcerated and had not made reasonable and substantial progress toward returning Harley home. As such, the circuit court's permanency order set a permanency goal of substitute care pending determination of termination of parental rights.

¶ 26   On April 16, 2021, DCFS filed a status report with the circuit court. The status report indicated that on March 3, 2021, Reggie received a sentence of five years' incarceration for aggravated DUI with license suspended or revoked, and five years' incarceration for driving on a revoked or suspended license second offense. On May 26, 2021, DCFS filed another status report with the circuit court which indicated that Reggie was transferred to the Graham Correctional Center in Hillsboro, Illinois, on May 17, 2021, and was not set to be released from IDOC until September 12, 2023.

¶ 27   The circuit court conducted a fitness hearing on July 14, 2021. Reggie was present in person and represented by counsel. The State called LaDia Jones-Singh as its first

12

witness. LaDia testified that she was employed by DCFS and became involved with this matter in June 2018, after a domestic violence incident between Reggie and Harley's mother. LaDia stated that a service plan was completed for Reggie and that Reggie was rated unsatisfactory progress on his services because he had not completed any of his services other than a substance abuse program from January to February 2019. LaDia testified that Reggie also failed to obtain stable housing or a stable income, and that Reggie failed to do so even during periods when he was not incarcerated.

¶ 28    LaDia stated that Reggie had been incarcerated twice while she was assigned to this case. The first time Reggie was incarcerated was in the county jail from September to November 2018, and then he went to prison. LaDia testified that she believed Reggie was released from prison around June 2020. According to LaDia's testimony, Reggie did not engage in services when he was incarcerated, but he did visit with Harley for two hours a month and then engaged in visitation with Harley shortly after he was released from prison.

¶ 29    LaDia testified that Reggie was again incarcerated in October 2020, due to a fatal accident in which Reggie was driving on a revoked or suspended license. LaDia stated that Reggie struck a child with his vehicle that resulted in the child's death, and that Reggie tested positive for methamphetamine at the time of the accident. LaDia stated that Reggie remained incarcerated from the charges stemming from the accident and that Reggie's projected parole date was September 2023.

¶ 30    LaDia testified that Reggie was very aggressive in his interactions with her and that it was her belief that Reggie was unfit. LaDia stated she believed Reggie to be unfit because Reggie was noncompliant with all his services except substance abuse treatment, and that

13

all of Reggie's incarcerations were due primarily to drug issues. LaDia also testified that the conditions that caused Harley to be removed from Reggie's care had not been corrected, nor had Reggie made any reasonable progress on his services during any nine-month period following the adjudication of abuse or neglect. LaDia stated that it was her opinion that the environment of Reggie's home would be injurious to Harley's welfare since Reggie had not addressed certain issues such as random drug testing, parenting, stable income, or stable housing. LaDia testified that she received a promotion in November 2020, and that the case was transferred to caseworker Kristina Wilson at that time.

¶ 31    On cross-examination, LaDia testified that it was possible that Reggie could have participated in counseling or other classes that she was not aware of, but further testified that it would have been Reggie's responsibility to provide her documentation of the completion of any courses. LaDia stated, that to her knowledge, Reggie did not complete drug and alcohol assessments at Comprehensive Services and that Reggie did not take counseling with Sparrow Counseling for anger management because Reggie was dropped for nonattendance. LaDia further testified that she had only conducted one team meeting with Reggie because he was very argumentative and "upset with us because I guess he wasn't hearing what he wanted to hear." LaDia acknowledged that Reggie did request help with obtaining housing and employment, but that there was nothing they could actually do for him. According to LaDia's testimony, the one team meeting occurred a couple of weeks before the fatal accident. LaDia stated that she would normally meet with a person she was working with monthly and that she had tried to find Reggie, but his whereabouts were unknown to her at times. LaDia also acknowledged that Reggie missed some of his drug

14

screenings due to being in prison, but also stated that some of the times Reggie missed his drug testing was because he failed to show up for testing.

¶ 32    On examination by the circuit court, LaDia stated that she had prepared Reggie's service plans of September 14, 2018, January 2, 2019, July 8, 2019, January 24, 2020, and August 4, 2020. She further testified that those documents would have been prepared in the normal course of business and would accurately reflect the progress of a parent towards reunification.

¶ 33    Next, the State called Kristina Wilson as a witness. Kristina testified that she was employed by DCFS and became involved in this matter in November 2020. Kristina stated that Reggie had been incarcerated for the entire time she had been assigned to this case. While Reggie was incarcerated in the county jail, Kristina testified that there were no services available to him. Once Reggie was transferred to the Graham Correctional Center, Kristina stated that she had reached out to the facility to coordinate services, but then Reggie was transferred to the River Correctional Center. Kristina stated that she had attempted to reach out to the River Correctional Center but was still waiting on a response.

¶ 34    On cross-examination, Kristina again acknowledged that no services were available at the county jail, no services were done at the Graham Correctional Center, and no services had been provided at the River Correctional Center to date. Kristina testified that she was waiting to find out what services were available at the River Correctional Center because DCFS acknowledges many of the services a parent completes while incarcerated. Kristina stated, however, that even if the services are completed while incarcerated, the parent

15

would still be required to follow-up upon discharge to show that the skills could be maintained.

¶ 35    Upon examination by the circuit court, Kristina testified that she had prepared the service plan filed on April 21, 2021, and that the service plan was kept in the normal course of business. Kristina also stated that Reggie had made no progress towards reunification. Kristina further stated on recross-examination that Reggie was rated unsatisfactory progress for his lack of progress in the recommended services. Kristina testified that DCFS could not control what services are offered for an incarcerated parent, and that if a parent does not comply, they are still rated unsatisfactory progress even though they are not able to comply.

¶ 36    Thereafter, the State rested, and Reggie was called to testify on his own behalf. Reggie testified that he was incarcerated for approximately a year from 2019 through 2020. Reggie stated that he was released from Vienna Correctional Center in approximately July 2020 and then was rearrested in October 2020. Reggie testified that he did an evaluation at Comprehensive Services in July of 2020 and went out there four or five times. As such, Reggie testified that he "completed that for DCFS." Reggie also testified that he participated in a parenting class from July through August at Southtown in Mt. Vernon, Illinois, and successfully completed that course. Reggie further testified that he did four or five sessions with Sparrow, but "there hadn't been no anger management out there for 18 months." While incarcerated, Reggie testified that he completed the Inside Out Dad program.

16

¶ 37 Reggie went on to testify that his projected release date was September 2023 and that it was his desire to continue to be involved in Harley's life. Reggie stated that it was his desire to establish a home and have custody of Harley once he is released and that he was willing to work with DCFS and take the necessary steps to accomplish that. Reggie testified that he had a tentative job doing drywall and carpentry with an individual in Mt. Vernon, Illinois, and that he planned on residing with his mother upon his release.

¶ 38 Upon cross-examination, Reggie testified that during the periods he was not incarcerated, he took one drug test for the evaluation he did at the counseling center, but that he only saw DCFS one time. Reggie again testified that he had completed the parenting class at Southtown, but that he could not complete anger management since it was not offered at the Sparrow counseling center. Reggie further testified that he had seen a mental health counselor at Sparrow who was trying to figure out why he was sent there since they did not offer anger management. Reggie stated that the counselor at Sparrow arranged a meeting with Reggie, LaDia, and LaDia's supervisor, but that he was never directed to attend anger management at any other location. Reggie went on to testify that he had completed a drug evaluation at Comprehensive Services and that they recommended services, which Reggie stated he completed. Reggie testified that he had completed all the various counseling and evaluations between July and September of 2020.

¶ 39 Thereafter, the defense rested, and the State called LaDia Jones-Singh in rebuttal. According to LaDia's rebuttal testimony, she was present in court and heard Reggie's testimony. LaDia stated that the meeting Reggie testified about occurred after he spoke with the counselor at Sparrow, and the purpose of the meeting was because Reggie had

gone to Sparrow and informed Sparrow that he did not know why he was there. As such, LaDia testified that she conducted a team meeting so that Reggie would know his services and what he needed to do. LaDia stated that Reggie was clearly instructed on the service plan that was in place at that time and was instructed on what to do. LaDia testified that to her knowledge, she had no information that Reggie followed any of the instructions that came out of that meeting. LaDia also stated that her supervisor asked Reggie at the meeting whether he was free of drugs because he was being aggressive, but that Reggie denied any drug use. LaDia noted, however, that Reggie tested positive for methamphetamine after the accident a few weeks later. LaDia also testified that if Reggie had completed the services he testified to completing, then he should have submitted the documentation of completion to her. LaDia stated it was possible that Reggie could have completed services; however, if he did not report it and provide proof, then it is taken as if he did not do it since he can say whatever he wants. LaDia testified that she had no evidence of Reggie completing those services.

¶ 40    Upon completion of the parties' closing arguments, the circuit court stated as follows:

"THE COURT: *** So I'm going to take the fitness determination under advisement. I want to set a status hearing, but I'd also like to set the best interest phase slash permanency hearing contingent upon the Court's ruling on fitness.

So I guess my question is: The status hearing would really just be a hearing to make sure that I have a deadline for making a fitness determination. So, [defense counsel], would you want [Reggie] to show up at the status hearing, because really

18

it'd just be more about making sure of the ruling, or just set the best interest stage slash permanency hearing now and [Reggie] would appear at that date?

* * *

[DEFENSE COUNSEL]: He doesn't want to come just for a status hearing. But if we do have further hearings, he would want to participate.

* * *

THE COURT: I think we are planning for a status. Is it correct, [defense counsel], that for any substantive hearing, your client is insisting he wishes to be in person?

[DEFENSE COUNSEL]: Yes. The status, we're okay with the video on status because that's just going to be a brief hearing. But best interest where he could lose his children, he needs to be here.

THE COURT: Okay. Yes, I agree with that."

¶ 41 On August 4, 2021, the circuit court entered a written order finding Reggie to be an unfit person by clear and convincing evidence. The circuit court determined that Reggie was an unfit person as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), in that Reggie failed to make reasonable efforts to correct the conditions that resulted in Harley's removal from his care for the nine-month periods after the adjudication that Harley was neglected or abused from October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021. The circuit court further found Reggie to be an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that Reggie failed to make reasonable progress toward

19

the return of Harley to his care for the nine-month periods after the adjudication that Harley was neglected or abused from October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021. Specifically, the circuit court found that Reggie did not satisfactorily complete the assigned services in his service plan, including parenting and anger management classes, over the relevant time periods listed, and that Reggie missed drug screening tests or tested positive when he took drug screening tests. The circuit court found that Reggie's refusal to complete his required services constituted both a lack of reasonable progress toward the return of Harley to his care and a lack of reasonable efforts to correct the conditions that resulted in Harley's removal from his care.

¶ 42    On September 1, 2021, DCFS filed a best interest report with the circuit court. The best interest report recommended that it was in Harley's best interest that Reggie's parental rights be terminated due to Reggie's lack of progress on his service plan, and that Harley had a strong support system with his foster family with whom he had been placed for over three years. DCFS's best interest report further stated that Harley's foster parents went "above and beyond to meet his needs and love him," and that the adoption of Harley by his foster parents would allow for permanency.

¶ 43    A best interest hearing was scheduled by the circuit court for September 29, 2021. On September 27, 2021, Reggie's counsel filed a motion to continue and for transcript of the fitness hearing conducted on July 14, 2021. According to the motion to continue, Reggie's counsel had received certificates of completion for a seven-week Systematic Training for Effective Parent course dated October 9, 2020, a 12-week Inside Out Dads course dated April 8, 2020, and a Money Smart course dated June 3, 2020. The motion to

continue stated it was the recollection of counsel that the State's witnesses had testified that Reggie had not completed these courses and, as such, a transcript of the fitness hearing was necessary for the proper representation of Reggie. The motion to continue further stated that the State had no objection to the motion. The same day, the circuit court denied the motion to continue but granted the request for the preparation of the transcript.

¶ 44 On September 29, 2021, the circuit court conducted a best interest hearing. Reggie appeared "by Zoom[3]" and all other participants were physically present in the courtroom. At the beginning of the best interest hearing, Reggie's counsel made an objection to proceeding without Reggie being present in person and without having the transcript of the fitness hearing. In response, the circuit court stated as follows:

> "THE COURT: I believe that you were the one that requested the video writ, [defense counsel]. Yes, I'm fairly certain. You stated that he didn't want to appear in person because he didn't want to have a transporter, so I believe it was by your request.
>
> * * *
>
> [DEFENSE COUNSEL]: I mean at the hearing the last time when we were discussing it, I do not recall requesting that, but I cannot tell that for sure. And in the event the transcript, when we get it, shows that I did ask for him to be here, I am now objecting to him not being here.

---

[3]"Zoom" is a video conferencing platform.

THE COURT: Okay. Well, the fifth district did address this issue on a ruling on July 26 of this year. And it did indicate that these hearings can be done with a remote appearance by Zoom, so we'll proceed."

¶ 45    The State called Misty Huff as its first witness. Misty testified that she was employed by DCFS and was the supervisor of Kristina Wilson, the primary caseworker for this matter. Misty stated that she had approved the best interest report that was prepared by Kristina and filed with the circuit court on September 1, 2021. As such, Misty testified that she was familiar with the contents of the report.

¶ 46    Misty stated that she believed Harley needed permanency and that the case had been pending for several years. Misty testified that Harley had been in his current foster home since approximately August 2018, and that he knows them as his family and has bonded with them. Misty also testified that Harley is familiar with who his parents are through visitation and that his foster family had supported that contact as long as it was supervised and safe. According to Misty's testimony, Harley's foster parents had one son who was 11 months apart from Harley in age, and Harley's foster parents treated Harley as their son. Misty stated that Harley's foster parents had a stable home in which Harley had his own room and that all of Harley's physical, emotional, and financial needs were being met. Misty further testified that Harley refers to his foster parents as "mom" and "dad" and there have been no concerns with regard to Harley's placement during the years he has been with his foster parents. Misty testified that she believed it was in Harley's best interest that the parental rights of Reggie be terminated. On cross-examination, Misty was presented with

22

the certificates of completion listed in the motion to continue and acknowledged that the certificate appeared to indicate that Reggie had completed those courses.

¶ 47    The State next called Heather McCall as a witness. Heather testified that she was Harley's foster mother and that she resided in Centralia, Illinois. Heather stated that she was married to Christopher Scott McCall, who goes by his middle name of Scott, and that she and Scott were licensed foster parents. Heather testified that Harley was placed in their home on August 20, 2018, and that he was three years old at that time. Heather stated that Harley was now six years old, and her other son was now five years old. Heather testified that the two boys had been together now for over three years. According to Heather's testimony, the boys are like brothers and her relationship with Harley was like she was his mother. Heather testified that she loved Harley and that Harley tells her that he loves her. Heather described her husband's relationship with Harley as "[h]e treats him just like his own son." Heather testified that it was her intention to adopt Harley if Reggie's parental rights were terminated. No further witnesses were called by the State.

¶ 48    Reggie was called by his counsel and testified on his own behalf. Reggie testified that he was requesting the case to stay open until he was released from prison so he could retain custody of Harley. Reggie stated that he had completed various counseling courses, but that no counseling was available where he was currently incarcerated. Reggie stated that he was scheduled to be released from IDOC late next year and had a potential job and housing. As such, Reggie testified that if the circuit court would find it in Harley's best interest to return home, he would take the appropriate steps necessary to make that happen.

23

¶ 49   After closing arguments, the circuit court found by a preponderance of the evidence that it was in Harley's best interest to terminate Reggie's parental rights. The circuit court noted that the evidence had demonstrated that Harley had been in his foster home for over three years and had lived there for approximately half of his life. As such, Harley's foster home is the place that Harley remembers and thinks of as his home. The circuit court also noted that it would be another year or two before Reggie would be released from incarceration and that Reggie would still be required to do services after his release to make an appropriate home for Harley. Therefore, it would be years of Harley not knowing what was going to happen with his future. The circuit court found it appropriate under the juvenile code to provide permanency for Harley and entered a written order permanently and forever irrevocably terminating Reggie's parental rights regarding Harley.

¶ 50   Reggie filed a timely notice of appeal of the circuit court's September 29, 2021, judgment terminating his parental rights. On appeal, Reggie argues that he was denied his constitutional right to attend the circuit court's best interest hearing in person. Reggie further argues that the circuit court's findings that Reggie was an unfit person and that termination of his parental rights was in the best interests of Harley were against the manifest weight of the evidence. Finally, Reggie argues that the circuit court abused its discretion in denying Reggie's agreed motion to continue the circuit court's best interest hearing.

¶ 51                                    II. ANALYSIS

¶ 52   "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure." *In re B'Yata I.*, 2013 IL

App (2d) 130558, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)), along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2020); *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 53                          A. Parental Unfitness

¶ 54    A determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is arbitrary, unreasonable, and not based on the evidence." *In re G.W.*, 357 Ill. App. 3d 1058, 1059 (2005). Even if the State alleges more than one count of unfitness, only one count needs to be proven to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000).

¶ 55    In this matter, the circuit court determined that the State had proven, by clear and convincing evidence, that Reggie was an unfit person as defined in section 1(D)(m)(i) of

25

the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), in that Reggie failed to make reasonable efforts to correct the conditions that resulted in Harley's removal from his care during the nine-month periods of October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021. The circuit court further found Reggie to be an until person as defined in section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)) in that Reggie failed to make reasonable progress during the nine-month periods of October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021. We will focus on the circuit court's finding regarding reasonable progress as it is dispositive to Reggie's claim that the court erred in finding him unfit.

¶ 56    Reggie argues that it was inherently unfair for the circuit court to find that he had not made reasonable progress toward the return of Harley to his care based upon his failure to complete services when those services were unavailable to him since he was incarcerated. Reggie states that he testified at the fitness hearing to the completion of various parenting and other counseling courses. As such, Reggie argues that he made a showing of participating and completing the few available courses and that he was taking the necessary steps to retain his parental rights.

¶ 57    While the mere fact of incarceration alone is not evidence of failure to make reasonable progress, incarceration can impede progress toward the goal of reunification. *In re Neveah R.*, 2017 IL App (2d) 170229, ¶ 21. Our supreme court has clearly held that time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m) of the Adoption Act, as the statute contains

26

no exception for incarcerated parents. 750 ILCS 50/1(D) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 343 (2010).

¶ 58     In this matter, Reggie's incarceration alone did not prevent him from complying with his service plan. Reggie was released from incarceration on November 29, 2018, and was not sentenced until June 27, 2019, yet the DCFS dispositional report filed on December 12, 2018, indicated that he had not complied with any services. Reggie was rated unsatisfactory progress on all services in his service plan filed on January 2, 2019, and the DCFS permanency report of May 30, 2019, also indicated that Reggie had made no progress on services. Further, the circuit court heard testimony that Reggie failed to participate in drug testing, and by his own testimony, Reggie had completed only one drug test during the time period that he was not incarcerated.

¶ 59     Further, reasonable progress is an objective standard that is not concerned with a parent's individual efforts and abilities. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). We review reasonable progress using an objective standard relating to making progress toward the goal of returning the child home. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). Reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress can be found if the trial court can conclude that it can return the child to the parent in the near future. *In re J.H.*, 2014 IL App 3d 140185, ¶ 22.

¶ 60     Reggie failed to demonstrate that he would be able to complete his service plan's requirements, including anger management, mental health, and domestic abuse, at any point in the near future. Reggie testified that his release date was September 2023, and

27

LaDia testified that Reggie would have to demonstrate that he could maintain proper housing, employment, and provide a safe environment upon completion of his services. It has been repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991). Given Reggie's release date and the testimony of LaDia, the circuit court had sufficient evidence to determine that it would be years of an unknown future for Harley if Reggie's parental rights were not terminated. Based on these factors, this court sees no basis upon which the circuit court could have found that it would have been able to order Harley returned to Reggie's custody in the near future.

¶ 61    Based on the foregoing, we find that the circuit court's finding that Reggie was an unfit person for failing to make reasonable progress during the periods of October 10, 2018, to July 10, 2019, July 11, 2019, to April 11, 2020, and April 12, 2020, to January 12, 2021, was not against the manifest weight of the evidence. We will not address the circuit court's finding that Reggie was an unfit person for failing to make reasonable efforts to correct the conditions that resulted in Harley's removal from his care since only one count needs to be proven to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). Therefore, we affirm that portion of the circuit court's judgment finding Reggie an unfit person as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)).

¶ 62                                    B. Best Interests

¶ 63    If the circuit court finds the parent unfit, the matter proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's

28

"best interest" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). In this case, the circuit court conducted a best interest hearing on September 29, 2021, and Reggie argues on appeal that his due process rights were violated when he was not permitted to attend the best interest hearing in person.

¶ 64 A parent has a fundamental liberty interest in maintaining a parental relationship with his or her child which is protected by the due process clause of the fourteenth amendment. *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). As such, there are certain due process and statutory safeguards parents are entitled to in actions to terminate their parental rights. *Id.*; 705 ILCS 405/1-5(1) (West 2020). These safeguards include the right to be present, to be heard, to present evidence material to the proceedings, and to cross-examine witnesses. *In re D.R.*, 307 Ill. App. 3d at 482; 705 ILCS 405/1-5(1) (West 2020).

¶ 65 The termination of parental rights is civil in nature and the general rules of civil practice apply. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 73. Illinois Supreme Court Rule 241 provides that:

> "The court may, upon request or on its own order, for good cause shown and upon appropriate safeguards, allow a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." Ill. S. Ct. R. 241 (eff. May 22, 2020).

¶ 66 The committee comments to Rule 241 indicate that a "case participant includes any individual involved in a civil case including the judge presiding over the case, parties, lawyers, guardians *ad litem*, minors in the care of the Department of Children and Family Services (DCFS), witnesses, experts, interpreters, treatment providers, law enforcement

29

officers, DCFS caseworkers, and court reporters." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). The committee comments also state that given the relative importance of live testimony in court, "a showing of good cause is required." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). Along those lines, the committee comments indicate that the court

"should take into consideration and balance any due process concerns, the ability to questions witnesses, hardships that would prevent the case participant from appearing in person, the type of case, any prejudice to the parties if testimony occurred by video conference, and any other issues of fairness. A court must balance these and other relevant factors in an individual case." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020).

¶ 67    In this matter, the circuit court was under the belief that Reggie had requested to attend the best interest hearing via video conferencing; however, that belief was misplaced as evidenced by the record of proceedings. Reggie had actually requested to appear in person at the best interest hearing and the circuit court had previously agreed that Reggie should appear in person. Further, even if Reggie had requested to appear via video conferencing, Rule 241 requires good cause to be shown regardless of whether the video conferencing appearance was upon a participant's request or on the court's own order. Ill. S. Ct. R. 241 (eff. May 22, 2020). The record on appeal in this matter does not indicate a good cause, nor does it denote any of the balancing factors that the circuit court may have taken into consideration in determining good cause.

¶ 68 The dissent states that the "statements made by the court on the record demonstrate that it did in fact consider and determine that the respondent appearing via Zoom was appropriate" (*infra* ¶ 83). The dissent fails, however, to note what statements by the circuit court it believes indicated a consideration of the factors. Instead, the dissent lists factors (*i.e.*, that Reggie had multiple felonies, could read and write the English language, and had waived his right to a jury trial) that have no bearing on any due process concerns and that were not citied by the circuit court when it directed Reggie to appear via video conferencing at the best interest hearing. The dissent also notes that the committee comments state "the distance of the respondent's resident to the courthouse and the need for a secure transport to and from the prison can constitute good cause" (*infra* ¶ 84). Although the committee comments do state that "distance from the courthouse" could be considered in a circuit court's determination of good cause, there is nothing in the record on appeal that indicated that secure transportation was unavailable to transport Reggie to the best interest hearing, and there was no discussion at the best interest hearing concerning a lack of transportation.

¶ 69 By this decision, we are not stating that a lower court must specifically state the factors it considers in making a good cause determination or that a specific finding of good cause must be made on the record. We are, however, stating that the record must demonstrate, in some manner, a good cause for allowing or requiring a participant to appear via video conferencing in compliance with Rule 241. Ill. S. Ct. R. 241 (eff. May 22, 2020).

¶ 70 Further, along with good cause, Rule 241 requires that the circuit court have appropriate safeguards prior to allowing a participant to appear via video conferencing. Ill. S. Ct. R. 241 (eff. May 22, 2020). The dissent states that Reggie was given "all necessary

31

safeguards during the hearing" (*infra* ¶ 82) but, again, fails to state a single safeguard that circuit court imposed prior to requiring Reggie to appear via video conferencing. The majority's review of the record on appeal can find no indication of any safeguards implemented by the circuit court—not even a single instruction to Reggie on the manner in which he could confidentially confer with his counsel. Again, by this decision we are not stating that the safeguards must be specifically stated on the record, but the record on appeal must demonstrate in some manner that safeguards were implemented as required by Rule 241.

¶ 71    We next note that the circuit court stated, when it made its determination to proceed with the best interest hearing with Reggie appearing via video conferencing, that "the fifth district did address this issue on a ruling on July 26 of this year. And it did indicate that these hearings can be done with a remote appearance by Zoom ***." The State argues that we should follow our holding in *In re P.S.*, 2021 IL App (5th) 210027, that was issued on July 26, 2021, and find that Reggie's virtual attendance did not in any way infringe on Reggie's rights.

¶ 72    Both the circuit court and the State have failed to address a vital portion of this court's findings in *In re P.S.* We found that the record in *In re P.S.* demonstrated that "the trial court allowed all of the case participants to testify or participate in the hearing remotely via a video conferencing platform because court operations were limited in Madison County due to the public health concerns presented by the ongoing coronavirus pandemic." *Id.* ¶ 59. This court also noted in *In re P.S.* that the "committee comments to Rule 241 specifically indicate that 'limited court operations' can constitute 'good cause' for

32

proceeding under the rule" and that the lower court had taken appropriate safeguards. *Id*. ¶¶ 59-60. As such, this court found in *In re P.S.* that the respondent's due process rights were not violated by the proceedings being conducted via video conferencing since the circuit court cited good cause and took steps to safeguard the integrity of the proceedings. *Id*. ¶ 63. In the case at bar, however, the record fails to demonstrate a good cause, or any safeguards as required by Rule 241.

¶ 73    The dissent also cites *In re P.S.*, stating that, as in *In re P.S.*, Reggie had "all the same access that would have been available if he appeared in person, and modern technology was used to assure that he was able to fully participate during the hearing" (*infra* ¶ 84). However, the record on appeal does not demonstrate that finding. In *In re P.S.*, the record clearly reflected that the lower court had limited operations due to COVID-19 and further reflected the utilization of breakout rooms in which the parent was able to confidentially confer with counsel. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 63. In this matter, there is no indication of limited court operations, problems with transportation, or any factor other than the confusion of whether Reggie requested to appear in person. There is also no indication within the record that Reggie was able to confidentially confer with his counsel or that he had all the same access. Unlike the dissent, we do not find that the single factor addressed by the circuit court at the best interest hearing that it believed Reggie had requested to appear via video conference to reflect a good cause nor do we find, without any indication within the record, that appropriate safeguards were implemented.

¶ 74    Finally, the dissent states that "[t]he majority reads too narrow the definition of what constitutes 'good cause' under Rule 241" and "reads the committee comments as if they

are an exclusive list of what constitutes good cause" (*infra* ¶ 81). The majority decision, however, makes no such inference. Instead, the majority decision is based upon our review of the record which we believe fails to reflect a good cause or appropriate safeguards. We further note that there have been multiple recent published and unpublished decisions discussing the use of video conferencing in these types of proceedings, and all of these cases have found that conducting some or all of the proceedings through video conference does not infringe on a parent's right to be present as long as the lower court proceeds pursuant to the framework of Rule 241. See *In re P.S.*, 2021 IL App (5th) 210027, ¶ 90; *In re B.R.*, 2022 IL App (2d) 210673-U, ¶ 39; *In re L.S.*, 2022 IL App (1st) 210824, ¶ 150; *In re Es. C.*, 2021 IL App (1st) 210197, ¶¶ 21, 28. In this matter, with all due consideration to the dissent, we find that the circuit court did not proceed pursuant to the framework of Rule 241, and as such, we find that Reggie's due process rights were violated, and that remand is required.

¶ 75    Therefore, we reverse that portion of the circuit court's judgment finding that it was in Harley's best interest to terminate Reggie's parental rights, and that portion of the circuit court's judgment terminating Reggie's parental rights with regard to Harley. Because we have determined that remand is required regarding the best interest hearing, Reggie's issues on appeal of whether the circuit court's finding that termination of Reggie's parental rights was in Harley's best interests was against the manifest weight of the evidence and whether the circuit court abused its discretion in denying the agreed motion to continue are moot.

¶ 76                                    III. CONCLUSION

¶ 77    For the foregoing reasons, we hold that the circuit court's finding that Reggie was an unfit person was not against the manifest weight of the evidence and affirm that portion of the circuit court's judgment. We reverse that portion of the circuit court's judgment terminating the respondent's parental rights based on the circuit court's finding that termination of his parental rights was in Harley's best interest where the record does not demonstrate a good cause, nor any safeguards implemented prior to requiring Reggie to appear via video conferencing at the best interest hearing. We remand this matter for further proceedings consistent with this decision.

¶ 78    Affirmed in part and reversed in part; cause remanded.

¶ 79    JUSTICE WELCH, concurring in part and dissenting in part:

¶ 80    I agree that the trial court properly found the respondent to be an unfit parent as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)).

¶ 81    However, I respectfully disagree with my colleagues where the majority reverses the trial court's decision to terminate the respondent's parental rights based on its best interests finding. The court did not err in conducting the best interests hearing with the respondent appearing via Zoom. I disagree with the majority's reading of the requirements of Illinois Supreme Court Rule 241 (eff. May 22, 2020). The majority reads too narrow the definition of what constitutes "good cause" under Rule 241. As cited by the majority, the rule states that "[t]he court may, upon request or on its own order, for good cause shown and upon appropriate safeguards, allow a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." *Id*.

35

However, the majority reads the committee comments as if they are an exclusive list of what constitutes good cause. This reading is too narrow, as the plain language of the rule does not have any kind of list for the definition of good cause. Furthermore, the committee notes from May 22, 2020, specifically keep the definition broad and within the court's discretion, where it states that the use of video technology "to conduct testimony under oath in civil trials increases accessibility to the courts, aids in the efficient administration of justice, avoids delays in trials, and more efficiently administers testimony for case participants who face an obstacle to appearing personally in court such as illness, disability, or distance from the courthouse." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020).

¶ 82 The purpose and requirements of Rule 241 were met in this case where the respondent was incarcerated at the time of the hearing, his appearance would require both a continuance and a secure transport to and from the prison, and the video technology utilized during the hearing, *i.e.*, Zoom, allowed the respondent to hear all of the testimony and evidence, cross-examine witnesses, and testify. The respondent was able to fully participate in the hearing and, based on the evidence presented, his presence was not necessary as it would have had no effect on his access. Additionally, any continued undue delay would be a waste of court resources and only further the uncertainty of the minor's potential adoption by the two foster parents whom he called mom and dad, had lived with during his formative years (from the ages of three to six years old at the time of the hearing), and whom he considered to be his family (which also included the parent's five-year-old son whom he called his brother). The respondent was given all necessary safeguards during

the hearing, and it was within the trial court's discretion to find good cause to continue with the hearing without further delay and to utilize the available video technology.

¶ 83    The record also reflects that, as to the respondent's request to appear in person for the best interests hearing, there was confusion on the part of both the trial court and the respondent's counsel. Though it is true that at the fitness hearing the respondent's counsel made clear that the respondent wanted to appear in person for the termination hearing, but consented to appearing via video for status conferences, there was later confusion on this issue. At the outset of the best interests hearing, the respondent's counsel stated on the record that he could not recall whether he had requested that the respondent appear in person as he did not yet have access to the transcript of the fitness hearing. Counsel then objected to the termination hearing being held without the respondent appearing in person. After considering the objection and the respondent's circumstances, the court overruled the objection and continued with the termination hearing, and the respondent appeared via Zoom. The statements made by the court on the record demonstrate that it did in fact consider and determine that the respondent appearing via Zoom was appropriate. The record establishes that the respondent had experience with the criminal justice system where he was convicted of multiple felonies, he could read and write the English language, he was combative with the court, he waived his right to a jury trial, and he admitted to using narcotics after the removal of the minor from his care. For these reasons, it is not necessary to reverse and remand the court's best interests finding and termination of the respondent's parental rights.

37

¶ 84    Affirming the trial court's termination of the respondent's parental rights would also be in line with this court's findings in *In re P.S.*, 2021 IL App (5th) 210027, that was issued on July 26, 2021. Here, as in that case, the reasons underlying the trial court's determination were referenced in the committee notes, where the notes state that the distance of the respondent's residence to the courthouse and the need for a secure transport to and from the prison can constitute good cause for proceeding via video.  Additionally, the respondent here had all the same access that would have been available if he appeared in person, and modern technology was used to assure that he was able to fully participate during the hearing. Therefore, as in *In re P.S.*, the use of video technology was appropriate.

¶ 85    I therefore dissent from the portion of the majority's order reversing the trial court's judgment with regards to the best interests finding and terminating the respondent's parental rights and remanding for further proceedings.